OPINION
On January 16, 1996, Shawn Unger presented herself to the emergency room of Coshocton County Memorial Hospital for medical treatment for her asthma. Appellee, Rajendra Patel, D.O., treated Mrs. Unger in the emergency room. Dr. Patel attempted several times to insert a breathing tube into Mrs. Unger's trachea. Thereafter, Mrs. Unger died.
On January 3, 1997, Mrs. Unger's husband, appellant, Jeffrey A. Unger, in his capacity as the Administrator of the Estate of Shawn C. Unger, Deceased, filed a complaint against appellee and the hospital alleging wrongful death and medical malpractice. A jury trial commenced on January 26, 1999. During the trial, the hospital was dismissed from the case. The jury found in favor of appellee. A judgment entry on jury verdict was filed on February 2, 1999.
On February 17, 1999, appellant filed a motion for new trial. By judgment entry filed May 20, 1999, the trial court denied said motion.
Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 I THE TRIAL COURT ERRED OR ABUSED ITS DISCRETION, TO THE PREJUDICE OF APPELLANT JEFFREY A. UNGER, IN DENYING HIS MOTION FOR A MISTRIAL.
 II THE TRIAL COURT ERRED OR ABUSED ITS DISCRETION, TO THE PREJUDICE OF APPELLANT JEFFREY A. UNGER, IN PERMITTING A DEFENSE EXPERT TO SPECULATE THAT THE DECEDENT SHAWN UNGER WAS "DOOMED" TO EARLY DEATH BY HER OWN CONDUCT.
 III THE JURY'S VERDICT AND THE TRIAL COURT'S FEBRUARY 5, 1999 JUDGMENT IS ERRONEOUS AND CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE AND PRODUCED A RESULT IN COMPLETE VIOLATION OF SUBSTANTIAL JUSTICE.
 IV THE TRIAL COURT ERRED OR ABUSED ITS DISCRETION TO THE PREJUDICE OF APPELLANT JEFFREY A. UNGER IN DENYING HIS MOTION FOR A NEW TRIAL.
 I
Appellant claims the trial court erred in denying his motion for mistrial. Appellant argues the opening statements made by appellee's counsel were so inflammatory that they poisoned the jury's verdict. We disagree.
The subject matter of the complained of statements was litigated prior to the trial via a motion in limine filed January 19, 1999. Said motion requested an order "precluding any witness or attorney from mentioning or referring to any contributory negligence by Shawn Unger during the trial of this matter, because it is barred by caselaw, and not relevant to issues in this case." In particular, appellant sought to exclude any mention of Mrs. Unger's noncompliance during prior hospital admissions, her smoking habit and the fact that she was a pet groomer.
A hearing on the matter was held on January 25, 1999. The trial court denied the motion, stating the following:
 The motion in limine as filed by Ms. Thivener on January 19th, 1999, which seeks an order prohibiting the introduction at trial the evidence regarding contributory negligence on the part of decedent, Shawn Unger, is found to be not well-taken and motion in limine is denied. I so hold without prejudice to a jury instruction which may tell the jury that contributory negligence is not an issue in this case.
 There is a practical aspect, Mr. Shroyer, that speaks in terms of the practicalities of having to inquire about prejudice against smokers, et cetera, in jury selection. There is also a practical aspect problem of trying to remove, to excise from all of the testimony any reference to the smoking history which this defendant brings to this case, which is, again, a very serious practical problem and one which runs contrary to what is, I think, the preferable method of presenting the evidence to the jury and then instructing the jury that they may or may not do with that evidence. The motion in limine is denied.
January 25, 1999 T. at 48-49.
In State v. Grubb (1986), 28 Ohio St.3d 199, the Supreme Court of Ohio defined a motion in limine as follows:
 `As related to trial, a motion in limine is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury.' The power to grant the motion is not conferred by rule or statute, but instead lies within the inherent power and discretion of a trial court to control its proceedings.
Grubb at 201, quoting State v. Spahr (1976), 47 Ohio App.2d 221, paragraph one of the syllabus.
Upon review, we find no error by the trial court in denying the motionin limine.
During opening statements, appellee's counsel made the following remarks:
 * * * The evidence will show that in this regard, of the medical advice that she received, that Mrs. Unger smoked against medical advice; that she was tested for allergies and that she was allergic to dogs and, yet, she maintained a dog grooming service, which caused these allergies, of course, to become more severe. Dr. Durve, the plaintiff's expert witness, will testify that when an asthma person takes care of themselves there is no reason why they would have to go to a hospital emergency room. It's not necessary. But in this case the evidence will show that Mrs. Unger had gone to the Bethesda Hospital emergency room twice and to the Coshocton emergency room 16 times before January 16th, 1996. Eighteen previous occasions she found it necessary to go to a hospital emergency room because of severe asthma.
 And, further, she would inform the doctors what tests they could perform and what tests she would not let them perform. And she would inform the doctors that `I brought my own mask with me, and you aren't going to give me another mask in order to charge me for it.' And you will hear that by reason of her own conduct she was a very difficult patient to care for.
T. at 3-4.
The hospital's attorney stated the following during his opening statement:
 She [Shawn Unger] has a long, long history of noncompliance, smoking against doctor's advice, not taking her medications as instructed.
* * *
 Not taking her medications as instructed by her physicians and not getting prompt medical attention when she needs it. From 1982 for the rest of her life she was a noncompliant patient.
* * *
 The evidence will show that on May 6th, 1991, Shawn Unger came into Coshocton memorial Hospital for one of her numerous asthma attacks. * * * She refused to be admitted against the advice of Dr. Patel back in 1991.
* * *
 It is at that time in 1991 that they did allergy testing on Shawn. And what did it show? It showed that Shawn was allergic to dogs, cats, house dust, and miscellaneous other things. In 1991 she knew that she was allergic to dogs and cats.
 We skip ahead to March of 1992. It is noted when she comes back in for one of her other asthma attacks that she continues to smoke cigarettes as she has for 20 years, one pack a day. * * * Dr. Gwinn in his discharge instructions on that occasion said to the patient she is to stop smoking.
* * *
 In November of 1992 she is back in for another severe attack. She continues to smoke a pack of cigarettes a day.
* * *
 Now we're into 1994, January. She is back in for a severe attack. Dr. Gwinn notes that she is still smoking. This is after many many years and many many instances of the doctor specifically telling her that she can't do that.
* * *
 So the evidence is going to show that you have a noncompliant patient who has a severe case of asthma throughout the last 15 years of her life. She is an extremely noncompliant patient. She does not take the medications that she is supposed to take. She does not seek timely care when she has one of these bad spasms.
T. at 10-11, 11, 11-12, 12-13, 13, 14, 20, respectively.
Appellant's counsel moved for a mistrial claiming the statements were inadmissible and inflammatory under Evid.R. 403. T. at 22-23. The trial court denied the motion for the following reasons:
 But my reasoning for that is, at least in part, that the history that Mr. Beausay alluded to I think is certainly relevant to the condition of Shawn Unger's lungs and it was Shawn Unger's lungs that did not work on that night. It apparently is an important prong of the defense theory that what the doctor did in this case was appropriate and that, perhaps, in all likelihood, she would have responded more appropriately if her lungs had been in different condition. And, in all of her history of medication, of smoking, of rejecting medical advice are at least tangentially relevant to the condition of her lungs on that particular night that she presented herself to this particular doctor.
T. at 24.
We note this court was not provided with a complete record. Even with the limited record before us, we find some of the issues argued as inadmissible and inflammatory were presented at trial:
[Testimony of Samuel J. Kiehl, III, M.D.]
 And does smoking have any effect on an asthma patient?
 It can. And it can have — it can have two effects. First of all, it has a direct irritative inflammatory effect. And people that have asthma have what we call reactive airway disease, and so the physical stimulate, negative stimulus of the smoke can aggravate the disease. The other thing is that smoke in and of itself is an irritant and causes destruction within the small airway, so there is kind of a combined effect.
 And from the records you reviewed, did it appear that Mrs. Unger smoked approximately a pack of cigarettes a day?
I know she was a smoker. I don't recall the amount.
* * *
 So, if, in fact, she did not smoke a pack of cigarettes a day, that would have an effect upon your opinion, whatever it may be, concerning life expectancy?
Yes.
T. at 168 and 193, respectively.
[Testimony of David V. Skirball, M.D.]
 Do you know if allergy tests indicated she was allergic to dogs and cats?
 She had been tested by an allergist and shown to have multiple allergies, including dogs and cats.
 And from the information you reviewed, is it your understanding that Mrs. Unger operated a pet grooming service?
That's correct.
* * *
 Now, doctor, do you have an opinion based upon reasonable medical probability as to whether or not Mrs. Unger had a normal life expectancy?
 I think it's very difficult to know what a normal life expectancy is. I think that asthmatics that are in and out of the emergency room, that continue to smoke, that work in environments that they know that they are allergic to and that need to be intubated, are seriously seriously ill and can expect to end up in situations like Mrs. Unger did may not have a normal life expectancy.
And does smoking affect life expectancy?
 Well, tobacco companies might not say that it does, but smoking is associated with emphysema and lung cancer and heart disease and hypertension, and it's generally thought by physicians to be bad for your general health.
T. at 209-210 and 227-228, respectively.
At oral argument, appellant's counsel admitted an economist was presented by appellant to establish the damage claim.[1] In consideration of that testimony, coupled with the cited testimony, we cannot say the trial court erred in denying the motion for mistrial. Further, on the issue of previous hospital admissions, the trial court specifically found "although such evidence is relevant, the evidence is not admissible because its probative value is substantially outweighed by the unfair danger of prejudice issues or of misleading the jury." January 29, 1999 T. at 9.
Given the lack of a complete trial transcript, we can only presume that the trial court gave the standard instructions on opening statements and closing arguments not being evidence, and that evidence is only the testimony of witnesses who testify at trial and the admitted exhibits. When portions of the transcript necessary to resolve issues are not part of the record, we must presume regularity in the trial court's proceedings and affirm. Knapp v. Edwards Laboratories (1980)61 Ohio St.2d 197.
Upon review, we find there was no unfair prejudice to appellant given the state of the record and the trial court's ruling.
Assignment of Error I is denied.
 II
Appellant claims the trial court erred in permitting Dr. Kiehl to testify that Mrs. Unger was "doomed to early death." We disagree.
The admission or exclusion of evidence lies in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217.
The entire complained of exchange was as follows:
 Now, Dr. Kiehl, do you have an opinion as to whether or not a person with Mrs. Unger's medical history would have a life expectancy that would be considered normal for a female 38 years of age?
 Well, if she didn't make any changes in her lifestyle or her care of her medical condition, she was doomed to early death.
T. at 182.
Given the admission at oral argument that an economist was called to establish life expectancy and damages, we find the complained of opinion was relevant albeit it was unkind in its bluntness.
Assignment of Error II is denied.
 III, IV
These assignments of error challenge the sufficiency and manifest weight of the evidence. In particular, appellant claims the jury verdict was erroneous and against the manifest weight of the evidence, and the trial court should have granted a motion for new trial which was based upon the issue of manifest weight.
Procedurally, appellant under App.R. 9(B) filed a notice of his intended assignments of error and his intention of providing only a partial transcript of the proceedings. There is no indication on these two notices of which parts of the transcript will be filed save for the statement that "all of the transcript(s) of proceedings previously transcribed and filed with the Court" would be included. See, Appellant's Praecipe and Statement filed June 17, 1999. In the common pleas file is a "Request for Partial Trial Transcript" filed by appellant instructing the court reporter to transcribe specific portions of the trial. See, Request filed February 10, 1999. Appellee's counsel was served a copy of this request. The request and notice were filed prior to the filing of appellant's motion for new trial.
Although one could argue that the February 10, 1999 request and notice could be enough of a notice to comply with App.R. 9(B), we find it does not fulfill the letter of the rule which states as follows:
 At the time of filing the notice of appeal the appellant, in writing, shall order from the reporter a complete transcript or a transcript of the parts of the proceedings not already on file as the appellant considers necessary for inclusion in the record and file a copy of the order with the clerk. * * * If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the weight of the evidence, the appellant shall include in the record a transcript of all evidence relevant to the findings or conclusion.
 Unless the entire transcript is to be included, the appellant, with the notice of appeal, shall file with the clerk of the trial court and serve on the appellee a description of the parts of the transcript that the appellant intends to include in the record, a statement that no transcript is necessary, or a statement that a statement pursuant to either App.R. 9(C) or 9(D) will be submitted, and a statement of the assignments of error the appellant intends to present on the appeal. * * *
The following items have been presented as the record to perfect this appeal:
Motion in Limine Hearing
Opening Statements of Jeffrey Beausay, Esq.
Opening Statements of Richard Reichel, Esq.
Cross-examination of Jeffrey Unger
Direct and Cross examinations of Dr. Skirball
Direct and Cross examinations of Dr. Samuel Kiehl
Direct examination of Dr. Dean Dobkin
Cross examination of Russell Fehrman
See, Request for Partial Trial Transcript filed February 10, 1999.
This is extremely troublesome for this panel given the assignments of error on manifest weight and denial of new trial. Conspicuously absent is any medical fact expert testimony of what actually happened in the hospital on January 16, 1996. There is no record of appellee's direct testimony.
The cross-examination testimony of Edward Russell Fehrman, a respiratory therapist, established that he saw Mrs. Unger in the emergency room and she refused to take a "peak flow test." T. at 31. Mr. Fehrman explained that he tried to intubate Mrs. Unger, but he was unsuccessful. T. at 32, 60. Thereafter, appellee took over. T. at 32-33, 60. Mr. Fehrman "bagged" Mrs. Unger and continued to do so until she was placed on a ventilator. T. at 33-34, 61-62.
The direct testimony of Dean Dobkin, M.D., appellant's expert witness, included his opinions based on his review of the medical records.[2]
Dr. Dobkin opined Mrs. Unger died from anoxic encephalopathy. T. at 111, 148. Dr. Dobkin explained Mrs. Unger died due to a lack of oxygen to her brain because she "was paralyzed [due to medicine] and, thus, unable to breathe on her own, and there was not timely intervention to produce an artificial airway by either the oral tracheal, nasotracheal, or cricothyroid route * * *." T. at 112. Dr. Dobkin further explained that the duty of the physician once the paralytic medicine is administered is to have "appropriate oxygenation" by bagging and creating an artificial airway. T. at 113, 142-145. The physician "has a window that's up to four minutes long to be able to ensure that oxygen levels are restored" and "must not permit the oxygen levels to drop to a dangerous level for more than that four-minute window." T. at 114. If the physician is unable to get the oxygen level back up with bagging, then surgical intervention is required (cricothyrotomy). T. at 117-118. Dr. Dobkin opined that seven attempts to intubate during an eighteen minute time period without surgical intervention was "one of the most egregious violations of the standard of care." T. at 131. He further opined from the medical records that the rise in oxygen levels after intubation indicates Mrs. Unger was not receiving sufficient air via the bagging attempt. T. at 135. Dr. Dobkin also testified to the various positions and procedures used on patients during intubation to secure success. T. at 138-140.
Appellee's expert, Dr. Kiehl, found no lapse in the standard of care regarding appellee's intubation approach. T. at 174. Dr. Kiehl opined the use of the paralytic medicine prior to intubation was proper, contradicting Dr. Dobkin's testimony. T. at 175. Dr. Kiehl further opined intubation was the proper course over surgical intervention. T. at 178. Dr. Kiehl explained the course of Mrs. Unger's inability to receive air was due to the fact that "she had advanced asthma attack that did, in fact, include a significant amount of bronchospasm on top of edema and probably mucous plugging." T. at 178. Dr. Kiehl testified Mrs. Unger's airway was maintained during intubation and even after intubation her airway was obstructed. T. at 179, 181. During Dr. Kiehl's cross-examination, appellant's counsel repeatedly questioned him regarding prior testimony of appellee and a nurse, testimony which was not provided to this court. T. at 193-194.
Dr. Skirball, a second expert witness for appellee, testified the medicines administered to Mrs. Unger were correct and met the standard of care. T. at 214. He opined the use of the paralytic medicine was appropriate. T. at 219. In addition, he opined the use of the "ambu bag" during the intubation process met the standard of care. T. at 221-222. Dr. Skirball noted even after intubation, Mrs. Unger was not exchanging air well and she suffered cardiac arrhythmias. T. at 223, 238. Dr. Skirball testified that unless appellee was a neck surgeon, he did not fall below the standard of care in continuing to intubate Mrs. Unger. T. at 226-227.
As noted in appellant's brief at 1, this case took seven days to try. This court has been provided with two hundred twenty-nine pages of actual testimony.[3] This is but a snapshot of the evidence presented. As noted supra, portions of the submitted testimony references testimony given by other witnesses which appellant did not provide for our review.
On a manifest weight of the evidence argument, a judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. C.E. Morris Co. v.Foley Construction Co. (1978), 54 Ohio St.2d 279. A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. Myers v. Garson (1993), 66 Ohio St.3d 610. We are reminded that at times courts have referred to appellate review as review by a thirteenth juror. State v. Thompkins (1997), 78 Ohio St.3d 380;Bland, et al. v. Graves (1993), 85 Ohio App.3d 644.
Due to the fact that we have not been given the entire record of the trial, we are loath to supplant the jury's interpretation of the evidence with our own very limited review. Therefore, based upon the authority ofKnapp, supra, we affirm the jury's decision.
Assignments of Error III and IV are denied.
The judgment of the Court of Common Pleas of Coshocton County, Ohio is hereby affirmed.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Court of Common Pleas of Coshocton County, Ohio is affirmed.
 __________ Farmer, J.
Edwards, P.J. and Gwin, J. concur.
[1] The economist's testimony was not presented for our review.
[2] We note Mr. Fehrman's testimony established time discrepancies and write overs in the medical records. T. at 68-69.
[3] The first twenty-four pages of the transcript is opening statement.